**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. H-08-574 |
| | § | |
| JAVED IQBAL | § | |

**<u>MEMORANDUM AND ORDER</u>**

The Court has before it Defendant Javel Iqbal's Motion to Suppress Evidence [Doc. # 25], as supplemented [Docs. # 33, # 34, and # 42] (collectively, "Motion"), to suppress all tangible evidence seized by law enforcement officers from Defendant's person on July 22, 2008, and to suppress a confession given in the early morning of July 23, 2008.  The Government responded to Defendant's Motion in four separate documents [Docs. # 26, # 31, # 35, and # 43].

The Court held an evidentiary hearing on the Motion on January 6, 2009.[1]  The Court has carefully considered all the evidence of record, the parties' arguments presented orally and in writing, and the applicable law.  The Court holds that the Government has met its burden to establish that the evidence obtained from Defendant during the July 22–23, 2008, events was lawfully acquired and Defendant's Motion should be **denied**.

**I.     FACTS**

The Government offered one witness, Oswaldo Jose Fong, an experienced law enforcement officer now employed as an agent in the Office of Inspector General of the United States Postal Service ("USPS").[2]  The Court credits Agent Fong's testimony in every

---

[1]     The Court gave the parties an opportunity to offer additional evidence on January 13, 2009.  Neither elected to do so.  The parties offered closing argument that day.

[2]     Fong previously had been with the Office of Inspector General for the Social Security
(continued...)

respect.

On July 22, 2008, Fong was one of the officers asked by a USPS investigator, Melissa Cheatwood, to assist in the execution of a search warrant in an investigation of possible fraudulent use of USPS "Voyager Credit Cards," credit cards provided by the USPS to USPS vehicle drivers for the purchase of gasoline and other items in the course of their duties. Fong and others met with Cheatwood on the evening of July 22, 2008. Cheatwood explained that she believed from the timing of transactions and other documentary evidence she had obtained that Defendant and/or other employees working the night shift at the Susser Chevron gas station (the "station") were improperly entering charges and taking the funds for their own use. Cheatwood explained that she believed, from a similar scheme discovered elsewhere, that the charges were being entered manually by the night employee(s) through improper use of credit card numbers and associated personal identification numbers ("PINs"). Cheatwood showed the agents a picture of Defendant and others employed at the station, but explained that she was unsure she had their correct names.

Cheatwood obtained a search warrant from Magistrate Judge Calvin Botley giving officers express authority to search the "premises" at 14555 Eastex Freeway, Humble, Texas, the gas station and convenience store where Defendant worked. The warrant contained no restrictions on the time of day of the search, and the affidavit makes clear that the bulk of the wrongdoing had occurred during the night shift. The warrant thus permitted the search to take place at night during Defendant's shift.

After Fong, other USPS agents, and various sheriff's deputies met outside the station, at about 9:30 p.m., four agents (including Fong) entered the station through the front doors.[3]

_____

[2]    (...continued)
      Administration and had spent several years with the Harris County Sheriff's Office. The dates of Fong's employment at the Sheriff's Office are not in the record, but it is noted that he worked in the theft, burglary and robbery division for about three years.

[3]    There were at least 12 officers eventually involved in the search, but only four were inside
                                                                                    (continued...)

The agents wore vests with the word "Police" on them, and announced "Police" and "Search Warrant."  The officers guided the several employees who were present away from the cash registers and put them in handcuffs.  The employees were told that they were not under arrest, but that they were being handcuffed for officer safety reasons.  The employees were placed along a wall while Fong and the other officers proceeded with a security sweep, looking for dangerous items throughout the store.

Almost immediately, at about 9:35 p.m., Fong spotted a semi-automatic handgun in plain view under one of the cash registers behind the counter at the front of the store.  He announced that he had found a loaded weapon and secured the gun.  Fong then called out to everyone present "who is the owner of this gun?"  Defendant volunteered that it was his.[4]  Fong then had another agent check the history of the gun in the National Crime Information Center ("NCIC") database.  While waiting for the results of the NCIC search, Fong orally gave Defendant *Miranda* warnings.[5]  Fong then asked Defendant where he got the gun.  Defendant said variously that he bought it from a customer at the store, or from a "friend," but did not remember the person's name.  Fong found these answers evasive and unconvincing.  He  explained that in his experience the purchase of a gun by a private individual is a "major" decision and generally purchasers recall where they obtained their weapons.  Fong also noticed that Defendant's name was different from the name under which the truck  Defendant drove was registered.  In combination, Fong found these facts suspicious.

Fong thereafter received the results of the NCIC search and learned that the gun was stolen.  The evidence establishes that the NCIC information disclosed that the gun had been stolen more than three years earlier, but there is no indication the officers focused on this fact at this time.  Accordingly, Fong placed Defendant under arrest for possession of stolen

---

[3]      (...continued)
         the station at the time relevant to the issues here. All officers carried visible weapons but they holstered.

[4]      There is no dispute Defendant speaks English without any difficulty.

[5]      *Miranda v. Arizona*, 384 U.S. 436 (1966).

property.

Fong placed Defendant under arrest, gave Defendant *Miranda* warnings a second time, and then moved him outside to a police vehicle.  Before placing Defendant in the vehicle, Fong searched Defendant and found a wallet, cell phone, and keys.  Fong then placed Defendant in the back seat of the car.  Defendant still was handcuffed.  Fong sat in the front and advised Defendant that he was going to inventory Defendant's wallet.  Defendant did not object and was very cooperative.  Fong found various papers in the wallet.  Defendant admitted the papers were his.  Defendant said initially that the numbers on the papers were calling card numbers, related to a wireless phone company that Defendant owned independent of his work at the station.  It was approximately 10 p.m.

Fong and Defendant waited at the Chevron station until after midnight until the owner of the station arrived almost two hours later.  The owner had been cooperating with law enforcement previously in the investigation and wanted to be present before the search by the agents of his office records and similar materials took place.  When the owner finally arrived, Fong and Defendant left the scene.

Fong transported Defendant to the Harris County Sheriff's Department Substation in Humble, Texas.  He retained custody of the contents of Defendant's wallet as well as the rest of Defendant's personal belongings.  Fong explained the events to Cheatwood, who explained in detail to Defendant his *Miranda* rights.  Defendant then read and signed (or initialed) a written list of the warnings in at least seven places.

Meanwhile, another officer (apparently Officer Tinnon) ran the gun in the NCIC system again and confirmed that it had been stolen more than three years earlier.  That officer presented the facts of the arrest to a Harris County assistant district attorney ("ADA"), and also explained the status of the USPS Voyager card investigation.  The ADA declined to prosecute the state law violation.  The full extent of the reasons are not in the record, but the incident report prepared by Officer Tinnin indicates that the length of time since the gun had been reported stolen was a factor in the prosecutor's decision. The USPS officers determined that they would nevertheless keep Defendant in custody because he was a strong suspect in the Voyager investigation.

Cheatwood and Fong proceeded to question Defendant for about two hours.  The questioning took place in a private room, with only the two officers present.[6]  During this questioning, Fong removed the handcuffs from Defendant's wrists.  The agents offered him water and breaks.  Defendant initially denied any involvement in any scheme regarding the Voyager cards.  Cheatwood confronted Defendant orally with information she had gathered from other sources and challenged Defendant's denials.  She and Fong also showed him the papers from his wallet and questioned him about those materials, among other matters.  About 90 minutes after the questioning began, Defendant admitted that he was involved in the Voyager card scheme.[7]

There is no indication that either officer was abusive, loud, physical, or threatening with Defendant.  There is no evidence that Defendant asked that the questioning end.  There is also no evidence that Defendant did not understand Fong or Cheatwood or that Defendant had any language barrier with the officers speaking English.

## II.   ANALYSIS

Defendant contends that the officers lacked probable cause to arrest him for possession of stolen property, specifically the gun found in the station, and that his arrest accordingly was unlawful.  Defendant also argues that all evidence (documentary and oral and written statements) flowing from that arrest, including seizure of the Defendant's wallet and statements he gave thereafter, should be suppressed as "fruits of the poisonous tree."  Defendant further contends that his consent to search his wallet and his confession were not voluntarily or freely given.  Defendant belatedly and without any cited authority contends that his answer to the officer's initial question about who owned the gun was unlawfully obtained.

### A.   Defendant's Arrest

#### 1.   Initial Question: "Who is the owner of this gun?"

*Miranda* warnings must be administered prior to "custodial interrogation.  *See*

---

[6]   At some point, the officers moved Defendant to another building.

[7]   At some point Defendant began to weep.

*Miranda*, 384 U.S. at 444.  Fong did not administer *Miranda* warnings prior to loudly asking all present in the gas station, "Who is the owner of this gun?"  If this question subjected Defendant to "custodial interrogation," then Defendant's admission of ownership must be suppressed.

"Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Id.  Miranda* protections do not attach unless both the custody and interrogation prongs are satisfied.

The Supreme Court has described the *Miranda* custody test as follows:

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.  Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.

*Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *see also Yardborough v. Alvarado*, 541 U.S. 652 (2004) (reviewing cases).

In *United States v. Bengivenga*, 845 F.2d 593, 598–600 (5th Cir. 1988) (en banc), the Fifth Circuit identified four factors relevant to determining whether there was custody in the absence of formal arrest: (1) the length of detention and interrogation; (2) the location of the encounter; (3) the number of officers present; and (4) the element of surprise in the encounter.  Custody did not require the presence of all factors, but more than one factor had to be present.  *Id.*; *see also U.S. v. Fike*, 82 F.3d 1315 (5th Cir. 1996), *overruled on other grounds, U.S. v. Brown*, 161 F.3d 256 (5th Cir. 1998).

In the case at bar, the first three *Bengivenga* factors weigh in favor of the questioning being noncustodial.  With respect to the first factor, the length of detention prior to Fong's question was minimal.  In *United States v. Harrell*, 894 F.2d 120, 124 n.1 (5th Cir. 1990), the Fifth Circuit expressed concern regarding detentions that last more than one hour.  In *Fike*, the Fifth Circuit concluded that actual questioning of a suspect that lasted fifteen

minutes qualified as a brief detention even when the interrogation occurred during the course of the execution of a search warrant which took several hours to complete. *Fike*, 82 F.3d at 1325. In the case at bar, Defendant had been detained at most for approximately five minutes before Fong asked the question regarding ownership of the gun. Furthermore, the actual questioning was very brief—one short sentence addressed generally to all present in the station. The Court finds that this brief detention suggests Defendant's detention was noncustodial.

With respect to the second factor, courts are less likely to find that a suspect was in custody when they were interviewed in familiar or neutral surroundings, that is, not at a police station. *See U.S. v. Collins*, 972 F.2d 1385 (5th Cir. 1992) (holding that a suspect was not in custody when the agents conducted the interview at the suspects' place of business and the agents explicitly and repeatedly informed the suspect that he was not under arrest). Here Fong's question took place at Defendant's workplace. This factor weighs in favor of the questioning being noncustodial.

Considering the third factor, the number of officers present, there were only four officers in the station when Fong made his inquiry. None of these officers' weapons were drawn and the officers had informed the employees that they were being handcuffed for officer safety reasons and that they were not under arrest. The officers were visibly conducting their safety sweep of the premises. The Court finds that this situation does not implicate concerns about suspects' vulnerability that underlies the Fifth Circuit's inquiry into the number of officers present. *See Bengivenga*, 845 F.2d at 598.

The fourth factor, on the other hand, weighs in favor of the question being posed in custodial context. The station employees did not have advance notice that the officers were going to search the premises.

Applying the custody test of *Keohane* and the factors from *Bengivenga*, the Court concludes that Defendant was not in "custody" at the time Fong asked "Who is the owner of this gun?" The ultimate inquiry is whether Defendant's freedom of movement was restrained to the degree associated with formal arrest. Immediately upon entering the store, the officers informed the employees that they were executing a search warrant. No guns were drawn.

When the officers handcuffed the employees, the officers explicitly stated that the employees were not under arrest but that they were being handcuffed for officer safety reasons.[8] Furthermore, Fong asked the question only a few minutes after handcuffing the employees. In sum, the circumstances viewed in totality establish that there was no functional equivalent of a formal arrest.

Because Defendant was not in "custody" for *Miranda* purposes, the Court does not reach whether Fong's question constituted "interrogation" for *Miranda* purposes.[9] Fong's failure to administer *Miranda* preinterrogation warnings to Defendant before Defendant admitted the gun was his did not violate Defendant's Fifth Amendment rights. Therefore, Defendant's admission of ownership of the gun will not be suppressed.[10]

---

[8] "Handcuffing a suspect does not necessarily dictate a finding of custody. *See United States v. Purry*, 545 F.2d 217, 220 (D.C. Cir. 1976). Strong but reasonable measures to insure the safety of the officers or the public can be taken without necessarily compelling a finding that the suspect was in custody." *U.S. v. Booth*, 669 F.2d 1231, 1236 (9th Cir. 1981).

[9] The Government also argues that even if Defendant was subject to unwarned custodial interrogation, that under the holding of *U.S. v. Patane*, 542 U.S. 630, 637 (2004), the nontestimonial physical fruits of the unwarned statements are not subject to the exclusionary rule. Because the Court concludes that Defendant was not in custody at the time of questioning, the Court does not reach the merits of the Government's argument.

[10] The Government argues that even if Fong's question was posed during a custodial interrogation for *Miranda* purposes—which the Court concludes it was not—the public safety exception to *Miranda* renders Defendant's statement of ownership admissible. "The public safety exception to *Miranda* allows the admission into evidence of statements given by a defendant before being given *Miranda* warnings when 'a situation posing a threat to the public safety' exists. *New York v. Quarles*, 467 U.S. 649, 655–60 (1984). This exception is a 'narrow exception' which in each case is 'circumscribed by the exigency which justifies it.' *Id.* at 658, 104 S. Ct. 2626." *U.S. v. Brathwaite*, 458 F.3d 376, 382 n.8 (5th Cir. 2006). At the time he asked the station employees who owned the gun, Fong had already retrieved and secured the gun, and the four employees were in handcuffs. The Government has not articulated a theory as to how the public actually was endangered or exactly what exigency existed. The Government thus has not justified overriding *Miranda* protections. No cited Fifth Circuit authority supports the Government's position. For example, in *Brathwaite*, the Fifth Circuit rejected the public safety exception as to a non-*Mirandized* question, "Are there any guns in the house," when asked after officers had performed two sweeps of the house and had both occupants of the house in handcuffs. Likewise, in *United States v. Raborn*, 872 F.2d 589, 595 (5th Cir. 1989), the Fifth Circuit stated in *dictum* that, "Unlike
(continued...)

### 2.   Subsequent Questioning of Defendant

After Defendant answered that he owned the gun, Fong orally gave Defendant *Miranda* warnings.  "Once adequate [*Miranda*] warnings have been given, a suspect may knowingly and intelligently waive his *Miranda* rights and agree to answer questions."  *U.S. v. Cardenas*, 410 F.3d 287, 292 (5th Cir. 2005).  An effective waiver of *Miranda* rights must be voluntary, and a determination of whether a waiver is voluntary has two components:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 393, 421 (1986); *see also U.S. v. Guanespen-Portillo*, 514 F.3d 393, 403 (5th Cir. 2008) (citing *Moran*, 475 U.S. at 421).  "The voluntariness determination is made on a case-by-case basis and is viewed under the totality of the circumstances surrounding the interrogation."  *Cardenas*, 410 F.3d at 293 (citing *United States v. Reynolds*, 367 F.3d 294, 298 (5th Cir. 2004)).  "A crucial aspect is the presence or absence of coercive behavior on the part of the government."  *Id.*

Considering the totality of the circumstances surrounding Defendant's decision to speak with Fong regarding where he purchased the gun, the Court concludes that Defendant knowingly and voluntarily waived his *Miranda* rights when Defendant answered the agent's follow-up questions.  Defendant had not been told he was under arrest, he was still seated (or standing) in the store with the other employees and the questioning by Fong was calm and non-threatening.  Defendant's waiver did not result from coercive behavior by the agents and he did not refuse to answer questions despite being instructed he was entitled to do so.  Accordingly, the statements Defendant made regarding where he purchased the gun are admissible.

---

[10]      (...continued)
. . . *Quarles*, . . . where the gun was hidden in a place to which the public had access, [the] truck, where the . . . officers believed the gun to be, had already been seized and only the . . . . officers had access to [it].  It is difficult therefore, to find that the public-safety exception applies."

### 3.       Search Incident to Arrest

The Government argues that the papers discovered in Defendant's wallet are admissible because they were obtained during a search incident to a lawful arrest.  A search incident to a custodial arrest is an exception to the warrant requirement of the Fourth Amendment.  A search incident to arrest is a "reasonable" search under that Amendment, *United States v. Robinson*, 414 U.S. 218, 235 (1973), if the search is to assure an officer's safety *or* to safeguard evidence.  *Virginia v. Moore*, 128 S. Ct. 1598, 1607 (2008) (citing *Robinson*, 414 U.S. at 235).  "A search enables officers to safeguard evidence, and, most critically, to ensure their safety during 'the extended exposure which follows the taking of a suspect into custody and transporting him to the police station.'"  *Id.* at 1607–08 (citing *Robinson*, 414 U.S. at 234–235).  Upon an arrest, the police may search the person and the area "within his immediate control," meaning the area from which he might gain possession of a weapon or destructible evidence.  *Chimel v. California*, 395 U.S. 752, 763 (1969); *United States v. Ivy*, 973 F.2d 1184, 1187 (5th Cir. 1992) (holding that the search of a closed briefcase within the defendant's reach incident to an arrest was valid), *overruled on other grounds by United States v. Thompson*, 122 F.3d 304 (5th Cir. 1997).  In *United States v. Castro*, the Fifth Circuit held that an officer's reading of a folded paper in a suspect's wallet was a valid search incident to arrest and did not require a warrant.  596 F.2d 674, 676 (5th Cir. 1979).

Thus, the constitutionality of Fong's search of Defendant's wallet and review of the papers found inside depends on the constitutional validity of Defendant's arrest.  *See Beck v. State of Ohio*, 379 U.S. 89, 91 (1964).  "Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."  *Id.*; *see also U.S. v. Johnson*, 445 F.3d 793, 796 (5th Cir. 2006) (citing *Beck*, 379 U.S. at 91).  "Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."  *Devenpeck v.*

*Alford*, 543 U.S. 146, 152 (2004) (citing *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). In considering what a reasonable person would have concluded, courts take into account the expertise and experience of law enforcement officials.  *U.S. v. Ortiz*, 422 U.S. 891, 897 (1975).

Defendant argues strenuously that the arrest was without probable cause because a conviction for possession of stolen property requires the theft be recent.[11]  Defendant argues that Fong, an experienced law enforcement officer, knew or should have known this legal requirement and, therefore, when the NCIC report came back that the gun had been stolen more than three years earlier, Fong knew or should have known he lacked probable cause to make the arrest.  This argument is unpersuasive.  The cases on which Defendant relies test the legal sufficiency of convictions, not the viability of a law enforcement officer's probable cause determination.  Furthermore, there is no factual basis to establish that Fong or the other officers knew or should have known that the theft had to be "recent" to be prosecutable and that three years would not qualify as "recent."  Indeed, Fong denied knowing such a requirement and the Court credits this testimony.[12]

Furthermore, Fong had other factual bases for making a probable cause determination. Prior to receiving the NCIC report indicating the gun was stolen, Fong determined that Defendant's statements about where he obtained the gun were suspicious because his answers were inconsistent and evasive.  Fong also relied on the fact that Defendant was not the registered owner of the truck he regularly drove.

On the basis of these articulated facts known to Fong at the time he arrested Defendant, Fong's belief that Defendant had committed or was committing a crime was reasonable.  Probable cause is determined by an objective test.  *See U.S.v. Lopez-Moreno*,

---

[11]   *Marbles v. State of Tex.*, 874 S.W.2d 225 (Tex.App.—Houston [1st Dist.] 1994, no pet.); *Sutherlin v. State*, 682 S.W.2d 546 (Tex. Crim. App. 1984); *Preston v. State*, 147 Tex.Crim. 79, 178 S.W.2d 522 (App. 1944).

[12]   Fong testified that he was aware of the five year statute of limitations period for possession of stolen property.  As the reported theft was within this period, Fong reasonably believed he had a sufficient basis to conclude that Defendant's possession of the stolen weapon was a crime.

420 F.3d 420, 432 (5th Cir. 2005).  An officer's subjective intentions have no impact on analyzing probable cause.  *Id.*; *see also United States v. Cooper*, 949 F.2d 737, 744 (5th Cir. 1991) ("Probable cause is determined by an objective test: it cannot be established simply by showing that the police subjectively believed that probable cause existed . . . .").

> Probable cause for a warrantless arrest exists when the totality of facts and circumstances within a police officer's knowledge at the moment of the arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense.  Although probable cause requires more than a bare suspicion of wrongdoing, it requires 'substantially less evidence than that sufficient to support a conviction.'

*U.S. v. Wadley*, 59 F.3d 510, 512 (5th Cir. 1995) (quoting *United States v. Muniz-Melchor*, 894 F.2d 1430, 1438 (5th Cir. 1990) (internal citation omitted)).  Because Defendant's arrest was constitutionally valid, the search of Defendant's wallet incident to his arrest was also constitutionally valid.  The documentary evidence discovered in the wallet is admissible.[13]

### B.    Questioning of Defendant at the Station House

Relying on *Wong Sun v. United States*, 371 U.S. 471 (1963), Defendant argues that

---

[13]    The Government alternatively contends that the search warrant for search of the station premises also allowed searches of people present when the warrant was executed.  The Court disagrees.  On the face of the warrant, only the box for search of the "premises" is checked; the box on the warrant form authorizing searches of "people" present is not.  The Government contends that the Affidavit in Support of the Search Warrant contains specific mention of the involvement of one or more employees, and when combined with the operational briefing in preparation for the execution of the warrant, it is reasonable that the officers executing the warrant believed that they could search the employees found on the premises.  The Government relies on *United States v. Leon*, 468 U.S. 897, 918–919 (1984), for the proposition that evidence derived from searches subsequently found to be invalid are admissible if obtained with the good faith belief that the arrest or warrant was valid.  This argument is legally unsupported.  The good faith exception articulated in *Leon* only applies when officers execute a search warrant that is subsequently found to be invalid.  The good faith exception does not operate to permit an officer to expand the scope of search beyond what is designated in the warrant simply because the officer has a reasonable belief that the scope of the warrant was broader than the face of the warrant indicates.  The Supreme Court's recent decision in *Herring v. United States*, No. 07-513 (Jan. 14, 2009), does not alter this result.  In *Herring* the Supreme Court held that exclusion (or suppression) was not mandated by an isolated negligent record-keeping error "attenuated from the arrest."  Here the officer's conduct in question, while arguably negligent, was not attenuated from the arrest.  The *Leon* good faith exception to the warrant requirement is inapplicable.

his oral and written confessions should be suppressed as fruits of a custodial interrogation without the benefit of *Miranda* warning.  Defendant also argues that his oral and written confessions should be suppressed because he did not knowingly and voluntarily waive his *Miranda* rights.  Defendant further contends that his rights were violated because the Government falsely and thus improperly contended that the evidence was "overwhelming." The Court disagrees.

As previously discussed, Defendant was not subject to custodial interrogation at the outset of this series of events when Fong asked who owned the gun he had found in the station.[14]  Subsequent to answering Fong's question posed to all present, "Who is the owner of this gun," Defendant received *Miranda* warnings on three separate occasions—after he responded that the gun was his, after Fong placed him under arrest for possession of stolen property, and prior to being questioned at the station house by Cheatwood and Fong.  The latter warnings were given carefully, in conjunction with a detailed written form advising him of his rights.  There is no indication that Defendant cannot speak and read English adequately.  The Court finds that he understood the information on the waiver form and understood what the officers had told him about his rights.  Indeed, he signed or initialed the one-page form in at least seven places.  In this context, the agents explained to him his right to terminate the interview at any time and for any reason, as well as a warning that statements he made could be used against him in court.

Considering the totality of the circumstances surrounding the questioning of Defendant at the station house (and previously that night), the Court finds that Defendant knowingly and voluntarily waived his *Miranda* right to remain silent when he confessed to involvement in the Voyager card scheme, and his waiver did not result from coercive behavior by the agents.  While the questioning occurred late at night and consumed almost two hours, there is no indication that the questioning session was coercive or threatening.

---

[14]     Moreover, even if Defendant had been subjected to custodial interrogation at Fong's initial questioning, a "suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings."  *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

The uncontradicted testimony is that Defendant was questioned by only two agents, and that he was not handcuffed.  He was provided breaks and offered water.  Furthermore, there is no indication that either agent was abusive, loud, or physically threatening.  There is no suggestion, despite the detailed warnings he was given, that Defendant asked to end the interview before his confession.

The Court also rejects Defendant's second point that the officers illegally misrepresented the evidence they had against him.  Defendant cites no authority to support the argument that officers could not exaggerate the status of their investigation.  In any event, the officers apparently believed they in fact had substantial evidence against him relating to the Voyager card scheme, both with or without the papers from his wallet.  Cheatwood had information incriminating Defendant, such as the fact that the vast majority of the suspicious transactions occurred during Defendant's work shift at the station.  Thus, there is no proof that the officers intentionally misrepresented anything.  In sum, the Court is not persuaded that the officers' comments about the evidence against Defendant during questioning at the station house were either false or coercive. The Government has established that the interview that gave rise to Defendant's confession was given voluntarily and that Defendant knowingly and voluntarily waived his *Miranda* rights.  Defendant's motion to suppress his confession is denied.

## III.   CONCLUSION

For the foregoing reasons, the Court concludes that Defendant was not subject to custodial interrogation when Fong asked who owned the weapon, that Defendant's arrest was based on adequate probable cause, and that the officers' questioning of Defendant after his arrest followed proper warnings about his rights.  The papers seized from Defendant's wallet are admissible as they were obtained during a search incident to a lawful arrest.  Defendant's oral and written confessions were given after he knowingly and voluntarily waived his *Miranda* rights.  Accordingly, it is hereby

**ORDERED** that Defendant's Motion to Suppress [Doc. # 25], as supplemented [Docs. # 33, # 34, and # 42] is **DENIED**.  It is further

**ORDERED** that the parties must appear for a pretrial conference on **February 17,**

**2009, at 9:45 a.m.** in Courtroom 9-F, United States Courthouse.  Trial of this case will commence **Monday, February 23, 2009, at 10:30 a.m**.

Signed at Houston, Texas, this 11<u>th</u> day of **February, 2009**.

Nancy F. Atlas
United States District Judge